## In re MUNROE.

(District Court, D. Massachusetts. December 22, 1913.)

No. 710.

1. WITNESSES (§ 21*) — SUBPŒNA DUCES TECUM — EFFORT TO PERFORM — CONTEMPT.

On a petition to punish respondent for contempt in failing to obey a subpœna duces tecum requiring him, as partner of a French firm of bankers and in charge of its New York office, to obtain and bring with him, to be introduced in evidence before the grand jury sitting in Massachusetts, certain checks alleged to have been drawn by one D., paid by the Paris house of the firm, and retained by them, evidence *held* to require a finding that respondent did not in good faith make an honest effort to obtain the checks.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 37–41; Dec. Dig. § 21.*]

2. WITNESSES (§ 21*)—SUBPŒNA DUCES TECUM—PRODUCTION OF DOCUMENTS—DUTY—POSSESSION.

Where respondent, as American managing partner of a firm engaged in banking in Paris and New York, was served with a subpœna duces tecum requiring him to produce before a federal grand jury certain checks alleged to have been drawn by one D. on the firm's Paris branch, which had been paid and were retained there, respondent, notwithstanding that the possession of the checks was joint and not solely in himself, was bound to make a reasonable effort to obtain the same from his Paris partners and produce them, and his failure and refusal to make such effort constituted a contempt.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 37–41; Dec. Dig. § 21.*]

3. WITNESSES (§ 21*)—SUBPŒNA DUCES TECUM—DISOBEDIENCE—DEFENSES—ADVICE OF COUNSEL.

That respondent, in refusing to produce certain paid checks in response to a subpœna duces tecum, acted throughout on the advice of counsel was no defense to a proceeding against him for contempt in deliberately disobeying the court's order requiring him to comply with the subpœna.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 37–41; Dec. Dig. § 21.*]

Petition for attachment of Henry Whitney Munroe for contempt, on complaint of the grand jury sitting in the District of Massachusetts. Granted.

Asa P. French, U. S. Atty., and William H. Garland, Asst. U. S. Atty., both of Boston, Mass., for petitioners.

Rushmore, Bisbee & Stern, of New York City, and Boyd B. Jones, of Boston, Mass., for defendant.

MORTON, District Judge. I find the material facts to be as follows: The defendant is a member of a partnership (Munroe & Co.) which consists of five partners and has been in existence at least ten years. It is organized under the laws of France and is engaged in the business of banking and foreign exchange. The defendant has been a member of the firm since its organization, and is now the senior partner, and has the largest individual interest; he is a citizen of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

United States. The principal place of business of the firm is in Paris, where three of the partners are resident, of whom one is a French citizen, and another is a brother of the defendant. It has also had, for ten years at least, a place of business in New York, in or near which city the defendant and one other partner reside. This place of business is carried on under the name of John Munroe & Co. Although the partnership is, as stated, organized under the French law, the rights of the partners inter se do not appear, as to the matters and papers concerned in these proceedings, to be different from what they would be under the law of this district. At times the defendant went to Paris and participated in the business there, and one of the Paris partners came to New York and participated in the business there.

In May, 1913, the United States officers had reason to believe that one Mary A. Dolan, of Brookline, Mass., might have been guilty of offenses against the criminal laws of the United States by smuggling merchandise imported by her from Paris, France, into the district of Massachusetts, and her conduct in relation thereto was under investigation by the grand jury for this district at the times herein referred to. She had had a deposit with Munroe & Co. at its Paris establishment, against which she had drawn checks which had been delivered to various persons in Paris in payment of accounts due them. These checks had been paid by Munroe & Co. at their Paris branch, and the paid checks were retained there.

In this state of facts, an agent of the treasury department called upon the defendant Munroe at the New York office of Munroe & Co. some time in May, 1913, explained the circumstances to Mr. Munroe, and requested that Munroe & Co. would obtain from the Paris house the checks in question so that they could be reached by process in this country. The defendant resented both the request itself and the manner in which the request was made. He told the officer that he would inquire whether the Paris branch was willing to forward the checks. He did so, putting his inquiry into a letter dealing with other subjects, and so phrasing it as to suggest a refusal rather than a compliance with the suggestion. The Paris house replied declining to forward the checks. Mr. Munroe at this time took the position, which he has ever since maintained, that he preferred rather to shield a customer of his firm, whose conduct was under investigation by the grand jury, than to assist the officers of justice in ascertaining whether the customer had probably committed a crime.

On September 19, 1913, the defendant and the other New York partner of Munroe & Co. were duly served with a subpoena duces tecum of this court, commanding them to appear before the United States grand jury in Boston, and to produce certain papers and documents therein specified, among which were certain paid checks drawn by Mary A. Dolan upon Munroe & Co. at their Paris house. Other papers were called for by the subpoena, the production of which is not now insisted upon, and as to which the defendant was informed by the United States officers that they need not be produced. A correct copy of said subpoena and returns of service thereon is annexed to the presentment of the grand jury for contempt. No question has

at any time been raised by the defendant that the subpœna required the production of an unreasonable number of documents or insufficiently described the documents which were required. The checks called for by it were material and important evidence upon the matters which the grand jury were investigating. At the time of the service of this subpœna, said checks were, and they still are, in Paris, in the possession of the firm of Munroe & Co., of which the defendant, as has been stated, was and is a member. In other words, the possession of the checks was in the defendant and his four partners as joint tenants.

This subpœna the defendant, under advice of counsel, entirely disregarded in so far as it required the production of papers or documents. He did not communicate to his partners in Paris the fact that the subpœna had been served upon him. He made no request upon the Paris house to forward the papers called for by it, and made no effort whatever to obtain any of the papers specified in it. He appeared before the grand jury October 22d and testified that he had not the papers called for, that he had made no effort whatever to obtain them since the service of the subpœna, and that he was under no obligation to make any effort to obtain said papers or checks. The other New York partner was excused from appearing before the grand jury, and no proceedings are pending against him.

Thereupon the defendant was presented by the grand jury for contempt, and these proceedings were instituted. The statements of fact in the presentment of the grand jury are true.

A hearing was had before me upon said presentment on October 29th, at which the defendant was present with counsel, and such evidence was taken as either party desired to offer. At said hearing the facts appeared to be as above stated, and at the conclusion of the hearing I said:

"I think, when the government required evidence for use in prosecutions, that as a citizen of the country he was bound to make a reasonable and honest and diligent effort, not to pass into unreasonable bounds (and plainly to procure a few checks was nothing unreasonable to ask of a man), to get the evidence requested when he was a joint owner of it. I do not think it is particularly important that the papers in this case are in Paris. They might be in Chicago; they might be in San Francisco. The fact is that a joint owner of documents called for by a subpœna duces tecum, without making any effort whatever to procure them, comes into court and says, 'I am not bound to make any effort.' I think he is. I haven't any doubt that upon the facts here the defendant is in contempt."

The district attorney thereupon moved that the defendant stand committed until the contempt was purged. Under the circumstances, I felt that such a course was too drastic. I called the defendant to the bench and put the following question to him:

"Mr. Munroe, you may step forward. Are you willing to make a real and honest effort to get these papers? I don't mean an effort, honest in one letter and covered by another letter that goes under another cover; but are you willing to make an honest effort upon your honor to do your best to get these papers over here?"

To which Mr. Munroe replied:

"I am perfectly willing to make that effort."

Somewhat later I said:

"I will leave it to Mr. Munroe this way: That you are to use, Mr. Munroe, your best efforts to get this information as promptly as possible. I will let it stand over upon your assurance that you will do all you can to expedite it. * * *

"Now, Mr. Munroe has said that he will do honestly, not only exactly honestly but honorably, his very best to get these papers here. I will let this case stand continued on that assurance without disposition for a month. It may stand over."

The district attorney suggested that the defendant be directed to cable for the papers. I said that I thought it unnecessary to put the defendant to that expense, but I understood, and the defendant understood, that it was essential to get the papers here as soon as possible, and that he was to endeavor to obtain them, in absolute good faith, as quickly as he could without the use of the cable.

At the conclusion of the hearing on October 29th, the situation of the case was that the court, without having formally adjudged the defendant in contempt, had expressed the opinion that he was in contempt, and had adjourned the matter without action, in order to give him an opportunity to purge or diminish the contempt by carrying out the agreement which he had entered into with the court, and making a sincere, though belated, effort to obtain the checks. Has he done so?

[1] Instead of promptly writing a personal letter requesting that the checks be forwarded to him, which would have been promptly complied with by his partners, the defendant delayed five days before writing at all. During those five days he had several consultations with his counsel in reference to the matter, and finally wrote, under their advice, a letter which was in part drafted by them, and which is now relied upon as being a performance of his agreement with the court. I do not so regard it. It was of a purely formal character; several other matters besides this one being referred to in it. With its inclosure it informed his partners that he was making the request under coercion, and it indicated plainly his hope and desire that the request be refused. It is not a real effort to get the papers.

During the five or six days which elapsed between the hearing on October 29th and the sending of this letter, Mr. Munroe's counsel had conferred with counsel for Mrs. Dolan, and had informed him of their attitude in the matter and of what Mr. Munroe was likely to do. From what was said, counsel for Mrs. Dolan inferred rightly that the Paris house would probably honor Mr. Munroe's request and forward the checks unless prevented by proceedings in France. The day after this interview, on November 1st, Mrs. Dolan sailed from New York for Paris. Mr. Munroe's letter to his partners, dated November 3d, with its inclosure, did not leave New York until November 5th, one week after the hearing before me. Subsequent to the interview between Mr. Munroe's counsel and Mrs. Dolan's counsel, Mr. Munroe sent a cablegram to his partners in Paris on November 3d, saying:

"Don't part with checks Mary A. Dolan. See our letter of November 3d."

At the time when Mr. Munroe's letter of November 3d, written, as he informed his partners, only because of his promise to the court, reached his partners in Paris, Mrs. Dolan had already been a day or more in

that city. Under date of November 14th, while Mrs. Dolan was in Paris, the Paris house wrote to the New York house, in a letter which referred to a number of other matters, as follows:

"In re matter of Mary A. Dolan. We deplore the great annoyance your Mr. Munroe was submitted to in this case. Acquiescing to your request we have given orders to have all the vouchers relating to this account from September 14, 1902, to the date of the subpœna searched and put together to be forwarded to you as soon as possible. We may, however, decide to consult our lawyer as to' the channel through which we had better send them, for instance, if it would not be wise to transmit them through the French foreign office and embassy."

And again under date of November 21st the Paris house wrote to the New York house as follows:

· "We inclose for your perusal the official injunction not to part with any documents pertaining to Mrs. Dolan's account, also a letter from our counsel, M. J. Moreau, who strongly urges us not to give up the vouchers. We therefore consider ourselves bound by the legal instrument and our lawyer's advice."

The language of this letter, *"the* official injunction," when no injunction, so far as appears, had theretofore been referred to, and "not to part with," exactly the language of Mr. Munroe's cable of November 3d, is worth noticing. No injunction had in fact been served upon the Paris house at this time. The only thing which had been served upon it was a notice from Mrs. Dolan which had no effect upon the rights of the Paris house to forward firm papers to the New York house. The letter from the French advocate which was inclosed explicitly referred to voluntary disclosure to third parties. The suggestion that the Paris house might forward partnership papers to the New York house through the French embassy seems plainly insincere.

The refusal of the Paris house to forward the checks to New York was communicated to the United States attorney, and an assignment was made to resume hearings on the contempt proceedings. Other counsel came into the case, and under his advice Mr. Munroe cabled on December 5th to his brother, George Munroe, one of the Paris partners:

"Commence proceedings immediately. Procure order of court give permission to send Dolan checks. Answer."

This was the first and only real effort which the defendant ever made to obtain the checks, and it was too late. The following cable reply was received:

"Have taken proceedings. For your guidance we inform you that a judgment will probably be delayed five months according to French law for distant case. Personal application was refused."

The last sentence refers to Mrs. Dolan's application for the delivery of the checks to her.

I am inclined to believe, although I.do not find it necessary so to find, that the letter of November 14th, from the Paris house to the New York house, in reply to the letter dated November 3d, was disingenuous, written at a time when the firm knew that legal proceedings were about to be instituted there by Mrs. Dolan to furnish them

with an excuse for withholding the checks, and that it was written to give an appearance of good faith to Mr. Munroe's conduct.

The respondent contended that under the French law the Paris partners were forbidden from sending these checks to the New York house on the ground that to do so would be a violation of professional confidence. Upon the evidence introduced before me I find that this is not the fact, and that the French partners at all times had, and still have, the right to forward these checks to the New York partners, in whose hands they could have been reached by this subpœna.

At any time prior to the notice of November 15th the Paris partners would have sent the checks in question to the defendant upon his real request therefor. The making of such a request involved no unreasonable exertion or expense on his part. He has not in good faith endeavored to perform his agreement of October 29th with the court, and he certainly has not done honestly and honorably "his very best to get the papers here." The result of his inaction and bad faith is that important evidence appears to have been lost to the United States, the result which he has at all times desired to bring about. This disposes of the questions of fact, as to which only two matters were seriously in controversy: (1) The French law; (2) whether the defendant had endeavored in good faith to carry out his agreement made with the court.

[2] As to the law, no decision very close to the case at bar has been called to my attention. Obviously every subpœna duces tecum requires a certain amount of effort on the part of the person subpœnaed to get together the books and papers called for and take them to court. It appears to be settled that where the person subpœnaed is the sole owner, or is solely entitled to the possession of such books and papers, he is required to make very considerable efforts to obtain and produce them. See In re Storror (D. C.) 63 Fed. 564. If the defendant were the sole owner of the checks in question, or solely entitled to the possession of them, there can be no doubt, I think, that it would have been his duty to obtain them from France and produce them as directed.

As to the duty of a person subpœnaed duces tecum with respect to books and papers which he owns, or to the possession of which he is entitled jointly with other persons, the law appears to be unsettled. In U. S. v. Collins (D. C.) 145 Fed. 709, it was held that one of several partners who had been served with a subpœna duces tecum, requiring him to bring into court certain books and papers belonging to the firm of which he was a member, was in contempt, for not doing so; it not appearing that he had been prevented from obeying the precept by his partners. Some of the English cases appear to take a rather different view, and there may be a valid distinction between the production of partnership books, which would naturally be required for the daily business of the firm, and the production of other papers, like those in this case, which are not necessary for daily use.

The question is of much practical importance, because, although in this case it arises between the United States and a foreign country, a similar question might arise in the state courts in respect to partner-

ships which have places of business in more than one state. It ought not to be necessary, in order to secure the production of books and papers jointly owned or possessed, to serve subpœnas upon all the joint owners or possessors. It is, I think, sufficient if one of them can be reached by process. It then becomes his duty to make an effort, reasonable under all the circumstances, to obtain the books or documents called for and to produce them. If, in fact, he is prevented from doing so by persons against whom he has no right to enforce his claim to the possession of such books or documents, he has a valid excuse for not complying with the directions in the subpœna. It is not, it seems to me, material whether the boundary line of a state or of a country lies between him and the books or documents. The test is his control. If, having a right of ownership or possession (either sole or joint), the person subpœnaed is in fact able to obtain and produce the books or documents called for by making a reasonable effort, he is bound to make that effort in entire good faith. This view seems to me in accord with many established principles in our law, wherein a single person of several jointly entitled to the possession of personal property may treat himself, and be treated by the court, as the owner thereof. The justification for putting a witness to such trouble and expense rests upon the same fundamental principle of law that permits a third person to be compelled to appear and testify, often at great inconvenience and loss, in a controversy which does not concern him. While the partnership of Munroe & Co. is organized under French law and does business in Paris, it also does business in the United States. It is subject to the laws of both countries. The fact that the checks in question are in Paris instead of San Francisco seems to me, as I said at the former hearing, to be without special significance.

[3] The result is that Mr. Munroe was in contempt on October 3d for having made no effort to obtain the checks in question, and that his position before the court is at present no better, to say the least, than it was at that time. He has acted throughout under the advice of his counsel, but that is no excuse for deliberate disobedience to an order of court and, under the circumstances here disclosed, little mitigation of his offense.